**Harvey L. CAREY**
v.
**The UNITED STATES.**
No. 532–52.

United States Court of Claims.
June 7, 1955.

Harvey L. Carey, Shreveport, La., pro se.

S. R. Gamer, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Thomas H. McGrail, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a suit by a former United States Attorney for the Western District of Louisiana to recover pay for the period during which he was in a temporary leave status pending an investigation into his conduct in office.

The plaintiff, Harvey L. Carey, having been duly nominated by the President

and confirmed by the Senate of the United States, assumed the duties of United States Attorney on August 29, 1950, at a designated salary of $7,800 per annum and served in that capacity until December 27, 1950.

About a week before the latter date the Attorney General of the United States received information suggesting or tending to show that the plaintiff on December 5, 1950 and subsequently had solicited bribes from persons against whom criminal charges were then pending or had been proposed in plaintiff's office. The Federal Bureau of Investigation was immediately directed to investigate the alleged misconduct. A short time later, after a preliminary report from the Federal Bureau of Investigation had been submitted, the Attorney General reported the alleged improper conduct of the plaintiff to the President, advising him that drastic action would probably be in order, and the President directed the Attorney General to take such action as he, the Attorney General, found to be warranted by the circumstances.

The reports which the Attorney General had received from the Federal Bureau of Investigation had caused him to conclude that plaintiff had either committed the criminal act of soliciting bribes or had exercised improper judgment by conferring with and attempting to entrap individuals who, the plaintiff contended at the time, were attempting to bribe him.

On December 27, 1950 the Attorney General of the United States, J. Howard McGrath, sent the following telegram to plaintiff:

"I am authorized to direct that you be placed on temporary leave status, effective immediately. Pending further investigation of the conduct of your office you are directed to turn over the affairs of your office to your assistant William J. Fleniken."

Plaintiff on December 27, 1950 was placed on temporary leave and informed that an investigation was to be made in the conduct of his office. He was granted an interview with the Attorney General on January 4, 1951 and was then informed that the investigation was in progress and that when it was concluded additional steps would be taken.

Plaintiff believed at the time that he was being placed on temporary leave with pay. Other than as disclosed in the telegram plaintiff was not specifically notified that he was not in a pay status until his resignation was accepted by the President on January 24, 1952. It is reasonable to assume, however, that upon receipt of the final pay check covering accumulated leave the plaintiff must have realized that he was no longer on the payroll.

After the conclusion of the investigation on February 26, 1951 the matter was referred to a grand jury which returned an indictment against the plaintiff on March 28, 1951.

On November 17, 1951 the Attorney General, by long distance telephone, requested plaintiff's resignation, but he refused to resign, notwithstanding he was told that if he did not resign he would be removed from office.

Plaintiff's attorney stated that the plaintiff would not resign and on November 19, 1951 advised the Attorney General by letter that any action taken at that time which would change Mr. Carey's status would prejudice his case. In reply thereto the Attorney General wrote plaintiff's attorney a letter agreeing that since plaintiff felt any such action might conceivably prejudice his case, no further steps would be taken to change plaintiff's status before his trial.

Plaintiff was not removed from office but voluntarily submitted his resignation on January 18, 1952 and notified the Attorney General by sending him a carbon copy of his letter to the President. The letter is set out in finding 13. It also advises the Attorney General of the plaintiff's acquittal by a jury empaneled to try him on the charges set out in the

indictment. The resignation was accepted by the President on January 24, 1952.

The plaintiff on May 16, 1951 was paid a per diem and travel expenses incurred in connection with an authorized trip to Washington, D. C., for a conference with the Attorney General concerning the action which had been taken against plaintiff. Plaintiff did not engage in the practice of law during the period he was in a status of temporary leave and no successor was appointed by the President until after his resignation was accepted on January 24, 1952. The plaintiff sues for his salary for the period from January 9, 1951 to January 24, 1952.

Both parties as disclosed by the briefs and oral arguments are in agreement on the principle that a United States Attorney may be removed from office by the President and that this question was settled in the case of Parsons v. United States, 167 U.S. 324, 17 S.Ct. 880, 42 L. Ed. 185, which holds that the President may remove a United States District Attorney at his discretion. In fact, the principle is well settled that the President has power to remove officers of the executive department whose appointments are by the President with the consent of the Senate. Reagan v. United States, 182 U.S. 419, 21 S.Ct. 842, 45 L. Ed. 1162; Shurtleff v. United States, 189 U.S. 311, 23 S.Ct. 535, 47 L.Ed. 828; Myers v. United States, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160. As we read sections 501 and 504 of Title 28, United States Code, they do not undertake to limit the President's power of removal. It may be doubtful whether a coordinate branch of the government would have authority to limit that particular power,

although this question we do not reach. We quote from Shurtleff v. United States, supra, 189 U.S. at page 317, 23 S. Ct. at page 537:

"In making removals from office it must be assumed that the President acts with reference to his constitutional duty to take care that the laws are faithfully executed, and we think it would be a mistaken view to hold that the mere specification in the statute of some causes for removal thereby excluded the right of the President to remove for any other reason which he, acting with a due sense of his official responsibility, should think sufficient."

We think also that the power to remove an executive officer appointed by the President would naturally include the lesser power to place one upon temporary leave without pay as incidental to the power to appoint and dismiss. Myers v. United States, supra; United States v. Murray, 100 U.S. 536, 25 L.Ed. 756; Ginn v. United States, 110 Ct.Cl. 637.

In effect, conceding these established principles, the plaintiff asserts that in the instant case the Attorney General had no authority to place the plaintiff in a status of leave without pay and that only the President personally could exercise this power.

The record, however, shows that the Attorney General advised the President before sending the telegram and was given authority by the President to take such steps as might be necessary in the premises, and that the President afterward was advised of the action taken and it was in effect approved by him.[1]

---

1. The then Attorney General testified in this respect as follows:

In the meantime as soon as this information came to me, I believe the very next day I went to see the President and I told the President that I was sorry for that report and didn't want to have a nasty situation break out in the Department of Justice, that one of the United States Attorneys appeared to be acting irregularly; and I told him briefly as I could what the general nature of the situation was, and told him it would probably call for rather drastic action. The President said to me, "You take such action as you feel is warranted. You have my permission to do whatever the situation calls for."

Q. Do you recall during the conversation when reference was made to action

As stated in our findings it must have been evident to plaintiff when his pay was stopped after his accumulated leave had expired that he was not in a pay status, and that he would not be paid during an investigation of criminal accusations, a grand jury proceeding and a criminal trial. In fact, his attorney stated as his reason for not resigning in November 1951 that it might prejudice his· case, and the Attorney General advised the attorney that if he felt any action taken at that time would conceivably prejudice the plaintiff's status it was far from his wish or desire that any such thing should occur, and he would see to it that no further action would be taken which would change his status before the trial.

In the circumstances we think that the action taken after consultation with the President, apparently with his approval, was sufficient exercise of the President's power and from a practical viewpoint the natural way in which the President would take a step of this kind. To hold otherwise would be like determining that a decree of a court was not action by the court because, forsooth, the order was prepared by the clerk and typed by the secretary.

If one will glance at Sections 2, 3 and 4 of Article II of the Constitution and observe the many duties that are devolved upon the President, he will realize the impossibility of the President's personally, physically and individually exercising all these powers, and that necessarily he must have assistance in executing such powers and discharging such responsibilities. He is given authority to nominate and, with the advice and consent of the Senate, to appoint thousands of officers; he is made Commander in chief of the Army and Navy of the United States and of the militia of the several states when called into the actual service of the United States; he is authorized to require the opinion in writing of the principal officer in each of the executive departments upon any subject related to the duties of their respective offices; he is given power to grant reprieves and pardons for offenses against the United States except in cases of impeachment; he is given the power, with the advice and consent of the Senate, to make treaties, appoint ambassadors, other public ministers and all other officers of the United States whose appointments are not otherwise provided for; the power to fill all vacancies that may happen during the recess of the Senate; he is given the obligation from time to time to give the Congress information of the state of the Union and recommend for their consideration such measures as he shall judge necessary and expedient; he is obligated to receive ambassadors and other public ministers and take care that the laws are faithfully executed, and is directed to commission all the officers of the United States.

In many of the acts of Congress the President is given broad powers and authority which in the nature of things

to be taken, the type of action that was discussed between you and the President, the type of action that would be taken?

A. Talked about action leading to dismissal of the United States Attorney if the facts warranted after the F.B.I. reported to me. * * *

Q. Mr. McGrath, do I understand then that the discussion you had with the President prior to the issuance of this telegram was a discussion in effect that the United States Attorney would ultimately have to be removed from office, and you were authorized or elected by the President to take whatever steps were necessary leading to the ultimate removal?

A. That's correct.

* * * * * *

Q. After that action was taken, that action indicated by the telegram, after that action was taken by you, did you again see the President on the same matter?

A. Well, I saw the President very shortly after that and informed him what I had decided, that I had decided to dismiss the United States Attorney and had done so.

Q. Did he approve that decision to you?

A. He did.

he must delegate to his appointed assistants.

There is a limit to human capacity. To expect the President to attend to all these obligations personally is out of the question. In the vast and complicated governmental setup in this broad, big country there must be a practical way of discharging these duties.

We hold that the action of the Attorney General, with the authority and approval of the President, was in practical effect the action of the President of the United States and the exercise by him of the power of removal and dismissal, and incidentally the lesser power of placing plaintiff in a status of leave without pay.

The petition is dismissed.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.